UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

WITHERSPOON, et al,

        Plaintiffs,

v.

UNKNOWN VINDER, et al.,

        Defendants.
_____/

Case No. 2:21-cv-40

Hon. Robert J. Jonker
U.S. District Judge

## REPORT AND RECOMMENDATION

### I. Introduction

This Report and Recommendation (R&R) addresses Defendants' motion for summary judgment based on Plaintiffs' failure to exhaust their administrative remedies. (ECF No. 39.)

Plaintiffs[1] filed suit pursuant to 42 U.S.C. § 1983 on March 2, 2021. In their amended complaint, Plaintiffs assert that while they were confined at Marquette Branch Prison (MBP) in Marquette, Michigan, MBP employees[2] conspired to violate

---

[1] At this stage of the case, Plaintiffs include the following state prisoners: (1) Norwood Witherspoon, #484291, (2) Devonte Dorsey, #967089, (3) Michael Kelly, #781124, (4) Demetric Thompkins, #575337, (5) Jabari Regains, #600539, (6) Christopher Michael Taylor, #408375, (7) Jaylen McCoy, #793044, (8) Keith Thomas, #436056, (9) Antonio Taylor, #618544, (10) Anthony Wallace, #705595, (11) Larry Stovall, #601852, and (12) Oliver Webb, VI, #283528. (ECF No. 37, PageID.267.)

[2] At this stage of the case, Defendants include: (1) Corrections Officer (CO) Unknown Binner, (2) CO Unknown Miller, (3) Sergeant (Sgt.) Unknown Whitlar, (4) Sgt. Unknown Beminster, (5) Prison Counselor (PC) Rebecca Horrocks, (6) CO Chris Lamentola, and (7) Warden Erica Huss.

and did violate their First and Eighth Amendment rights. (ECF No. 37, PageID.285-288.) Specifically, Plaintiffs alleged that they were transferred to MBP following a major disturbance in their housing unit at Chippewa Correctional Facility (URF) in Kincheloe, Michigan. (*Id.*, PageID.270.) Shortly after arriving at MBP, Plaintiffs began testing positive for Covid-19 and complaining about the conditions in the facility. (*Id.*, PageID.271-272.) Plaintiffs say that while they were suffering from Covid-19, Defendants authorized or participated in the deployment of chemical agents during a cell extraction. (*Id.*, PageID.272-277.) Defendants then cut off Plaintiffs' access to their phones and JPay accounts.[3] (*Id.*, PageID.271-272.)

Defendants now move for partial summary judgment based on Plaintiffs' failure to exhaust their administrative remedies. (ECF No. 39.) In support of this motion, Defendants conceded that Plaintiffs C. Taylor and Wallace exhausted their claims before filing this action. But Defendants argued that Plaintiffs Witherspoon, Kelly, Thompkins, Regains, McCoy, Thomas, A. Taylor, Stovall, and Webb failed to appeal any grievances related to the October 20 incident through step III of the grievance process, and that Dorsey's grievance related to the incident did not grieve the named Defendants. (*Id.*, PageID.304-307.) Plaintiffs responded, asserting that Plaintiffs Witherspoon, Kelly, Thompkins, Regains, McCoy, Thomas, A. Taylor, Stovall, Webb, and Dorsey filed grievances related to the October 20 incident that

---

[3] JPay is the system through which MDOC prisoners may send and receive electronic messages. *Electronic Messages – Sending to Prisoners*, Department of Corrections (last visited Sept. 13, 2022), https://www.michigan.gov/corrections/services/family-information/electronic-messages -sending-to-prisoners.

2

were rejected as non-grievable.[4] (ECF No. 45, PageID.432-433.)  In reply, Defendants argued that Plaintiffs were required to appeal those rejections through Step III of the grievance process, or to exhaust their claims during the Warden's Forum.  (ECF No. 49, PageID.489.)

The undersigned respectfully recommends that the Court deny Defendants' motion for summary judgment because there are genuine issues of fact concerning whether Michigan Department of Corrections (MDOC) Policy Directive (P.D.) 04.01.150 was available to Plaintiffs Witherspoon, Kelly, Thompkins, Regains, McCoy, Thomas, A. Taylor, Stovall, Webb, and Dorsey, and whether they exhausted the remedies set forth therein.

## II.   Factual Allegations

In September of 2020, Plaintiffs resided in the Neebish Unit at URF.  (ECF No. 37, PageID.270.)  Plaintiffs say that on September 13, 2020, an officer tased a Neebish Unit inmate in the face.  This led to a major disturbance in Neebish Unit.  Following that disturbance, Plaintiffs were transferred to MBP.  (*Id.*)

When Plaintiffs arrived at MBP, they were placed in C-Unit.  Prior to Plaintiffs' arrival, C-Unit had been closed for various health code violations dating back to 2016.  (*Id.*)  Plaintiffs say that on approximately October 4, 2020, inmates in C-Unit began testing positive for Covid-19.  Those inmates were not removed from the C-Unit despite their positive tests.  (*Id.*)

---

[4]   Plaintiffs ask the Court to either deny Defendants' motion for summary judgment, or to defer consideration of the motion until Plaintiffs have had the opportunity to engage in reasonable discovery.  (ECF No. 45, PageID.433.)

Plaintiffs Regains, Witherspoon, Thomas, and others began complaining to prison staff about the conditions of the C-Unit, including the cleanliness of the cells, lack of showers, exposure to inmates with Covid-19, and lack of medical assistance. (*Id.*) Plaintiffs say that MBP staff ignored their complaints, leading Plaintiffs Regains, Witherspoon, Dorsey, Stovall, Wallace, Thomas, and others to write the Assistant Resident Unit Supervisor, the Resident Unit Manager, and Warden Erica Huss. (*Id.*, PageID.270-271.) On October 15, 2020, Plaintiff Regains and others filed grievances about the unsatisfactory conditions in C-Unit. (*Id.*, PageID.271.)

Plaintiffs say that by October 20, 2020, they had all tested positive for Covid-19. On October 20, 2020, Plaintiffs say that MBP dispatched an Emergency Response Team (ERT) including all Defendants other than Horrocks and Huss to C-Unit in order to perform a cell extraction. (*Id.*, PageID.272.) Plaintiffs asked to be removed from their cells before the ERT employed any chemical agents, explaining that they had tested positive for Covid-19, and that they were symptomatic. (*Id.*, PageID.272-273.)

Plaintiffs claim that they were ignored, and that while performing the cell extraction, the ERT employed multiple rounds of chemical agents. (*Id.*, PageID.273.) The chemical agents spread throughout C-Unit and recirculated into Plaintiffs' cells, leading Plaintiffs to experience breathing problems and chest pains. Plaintiffs complained, and requested medical treatment, but the ERT members mocked them and ignored their pleas. (*Id.*, PageID.273-275.) Plaintiffs then asked that the ERT at least open the windows in C-Unit to bring in fresh air, but the ERT members again

4

ignored them. (*Id.*, PageID.273.) Plaintiffs say that the ERT watched as Plaintiffs cried, choked, vomited, and rubbed their swollen eyes. (*Id.*)

According to Plaintiffs, Defendant Lamentola stated: "You guys like complaining and writing grievances, well there you go." (*Id.*, PageID.274.) Defendant Miller told Plaintiffs to lay down, and told them that the worse they cried, the worse it would get. When Plaintiff Witherspoon informed ERT members that he had asthma, and asked for medical assistance, Defendant Binner responded, "You guys should have thought about that before destroying Neebish Unit." (*Id.*, PageID.275.) When Plaintiff Dorsey asked why the ERT employed chemicals at all and complained that the ERT members were punishing C-Unit for the disturbance at URF, Defendant Lamentola allegedly responded: "You guys came in as a unit. We will deal with you guys as a unit . . . You guys should think about that the next time you all destroy a unit." (*Id.*)

When Defendants Whitlar and Beminster conducted rounds later in the morning, Plaintiffs complained about the use of chemical sprays and the retaliation against them for the URF disturbance. (*Id.*, PageID.275-276.) Defendant Whitlar allegedly told Plaintiffs that they were fine, and Defendant Beminster told Plaintiffs to file grievances. (*Id.*, PageID.276.) When Plaintiffs requested medical assistance and showers, Beminster told them to kite[5] health care. (*Id.*) According to Plaintiffs, they all experienced physical injuries as a result of the October 20 incident, and

---

[5]    Kites are the written communications that prisoners send to prison staff when they need something.

several of them missed work. (*Id.*, PageID.281.) Plaintiffs say that members of the ERT authored false reports after the October 20 incident to justify their actions. (*Id.*, PageID.284.)

According to Plaintiffs, Warden Huss conducted rounds on October 24, 2020. During her rounds, many of the C-Unit inmates complained about the October 20 incident. (*Id.*, PageID.276.) Warden Huss allegedly responded: "You guys are overreacting and remember you wouldn't be here if you didn't destroy Neebish Unit. You guys will learn to follow the rules at this facility." When Plaintiffs emphasized that the ERT used chemical agents despite the fact that Plaintiffs had Covid-19, and then refused Plaintiffs medical care, Huss responded: "I'm not concerned with any of that . . . . I'm concerned with keeping staff and finding staff to work the prison." (*Id.*, PageID.277.) Huss also stated that she didn't see anything wrong with her staff's conduct, but she did take issue with Plaintiffs not following the rules. (*Id.*)

Plaintiffs contend that Huss was aware that her staff regularly used chemical agents as punishment even before the October 20 incident. (*Id.*, PageID.281-282.) But Plaintiffs say that Huss never disciplined her staff. Plaintiffs say that Huss allowed the excessive use of chemical agents to become a de facto policy at MBP. (*Id.*)

Plaintiffs finally claim that after they informed their family members of the conditions of C-Unit using their JPay accounts, and their family members began lodging formal complaints on their behalf, MBP staff cut off Plaintiffs' access to their phones and JPay accounts. (*Id.*, PageID.271.) On November 5, 2020, Plaintiff

Regains spoke with C-Unit PC Horrocks and asked why he could not use the phone or JPay. Plaintiffs say that Horrocks responded:

> Maybe if you didn't complain so much your phone and JPay would still be working. Your family calling is not going to help your case either. You guys tore up Neebish Unit, and now you guys come here filing grievances, and complaining all day, what do you think is going to happen?

(*Id.*, PageID.271-272.) When Regains asked why MBP would remove his access to the phone and JPay when he was fighting a deadly virus, Horrocks allegedly stated:

> Perhaps you will think about that before you guys destroy our unit. Just think Mr. Regains, why are you in the hole?[6] . . . . Then think about how now you are complaining about clean cells, and showers, it's a little contradicting. As you had clean cells and access to showers back at URF. This is Marquette.

(*Id.*, PageID.272.)

### III.   Procedural History

Plaintiffs filed suit pursuant to 42 U.S.C. § 1983 on March 2, 2021. (ECF No. 1.) Plaintiffs initially included the twelve aforementioned state prisoners as well as state prisoner Raymond Williams, #688523.[7]

On June 16, 2021, the Court severed Plaintiffs' claims into new, related actions. (ECF No. 15.) Although the Court recognized that Plaintiffs' claims could be joined under Fed. R. Civ. P. 20, the Court foresaw complications arising out of their

---

6      "The hole" is another term for administrative segregation.
7      This Court granted the following Plaintiffs leave to proceed *in forma pauperis*: (1) Witherspoon, (2) Thompkins, (3) Williams, (4) Dorsey, (5) C. Taylor, (6) Wallace, and (7) Stovall. (ECF No. 6, PageID.112-115.) This Court denied the following Plaintiffs leave to proceed *in forma pauperis*: (1) Regains, (2) McCoy, (3) Thomas, (4) A. Taylor, (5) Webb, and (6) Kelly. (ECF No. 6, PageID.110-112; ECF No. 11, PageID.137.)

status as pro se prisoners. (*Id.*, PageID.175-176.) For example, the Court noted that if even one Plaintiff was transferred to a different facility, Plaintiffs would be unable to provide pleadings signed by every plaintiff, as required by Fed. R. Civ. P. 11(a). (*Id.*, PageID.177.) When the Court severed Plaintiffs claims, it ordered each individual Plaintiff to file amended complaints in their respective cases. (*Id.*, PageID.179.) When Williams failed to adhere to this order, the Court dismissed his case. (W.D. Mich. Case No. 2:21-cv-141, ECF No. 19.)

On March 22, 2022, attorney Ronnie Edward Cromer, Jr. appeared on behalf of Plaintiffs, and moved to consolidate the twelve remaining cases. (ECF No. 27.) Because Plaintiffs were no longer proceeding pro se, the Court granted Plaintiffs' motion. (ECF No. 30, PageID.251.)

## IV. Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury[8] or whether it is so one-sided that one

---

[8] If defendants move for summary judgment on the basis of exhaustion under the PLRA, and the court determines that there is a genuine issue of material fact, the issue need not be submitted to a jury. *Lee v. Willey*, 789 F.3d 673, 678 (6th Cir. 2015). Instead, the court may conduct a bench trial to resolve the issue. (*Id.*) In a bench trial on exhaustion, the defendants must show that the plaintiff failed to exhaust his administrative remedies by a preponderance of the evidence. *Id.* at 677 (citing *Jones v. Bock*, 549 U.S. 199, 218 (2007)) ("Failure to exhaust administrative remedies is an

party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

V.  **Exhaustion**

A prisoner's failure to exhaust his administrative remedies is an affirmative defense, which Defendants have the burden to plead and prove. *Jones v. Bock*, 549 U.S. 199, 212-16 (2007). "[W]here the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986). The Sixth Circuit has repeatedly emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). Accordingly, summary judgment in favor of the party with the burden of persuasion "is

---

affirmative defense, which the defendant has the burden to plead and prove by a preponderance of the evidence."); *Richards v. Perttu*, No. 2:20-CV-76, 2022 WL 842654, at *1 (W.D. Mich. Mar. 22, 2022) (affirming a magistrate judge's ruling that the preponderance of the evidence standard applies in a bench trial on exhaustion).

inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

Pursuant to the applicable portion of the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must exhaust his available administrative remedies. *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 733 (2001). A prisoner must first exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741; *Knuckles El v. Toombs*, 215 F.3d 640, 642 (6th Cir. 2000); *Freeman v. Francis*, 196 F.3d 641, 643 (6th Cir. 1999). To properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Jones*, 549 U.S. at 218-19; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 549 U.S. at 218-19. In rare circumstances, the grievance process will be considered unavailable where officers are unable or consistently unwilling to provide relief, where the exhaustion procedures may provide relief, but no ordinary prisoner can navigate it, or "where prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross v. Blake*, 578 U.S. 632, 644 (2016).

"Beyond doubt, Congress enacted [Section] 1997e(a) to reduce the quantity and improve the quality of prisoner suits." *Porter*, 534 U.S. at 524. In the Court's view, this objective was achieved in three ways. First, the exhaustion requirement "afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Id.* at 525. Second, "the internal review might 'filter out some frivolous claims.'" *Id.* (quoting *Booth*, 532 U.S. at 737). And third, "adjudication could be facilitated by an administrative record that clarifies the contours of the controversy." *Id*. When institutions are provided adequate notice as required under the PLRA, the opportunity to address the claims internally furthers the additional goals of limiting judicial interference with prison administration. *Baker v. Vanderark*, 1:07-cv-004, 2007 WL 3244075, *5 (W.D. Mich., Nov. 1, 2007).

MDOC P.D. 03.02.130 (effective March 18, 2019) sets forth the applicable grievance procedures for prisoners in MDOC custody at the time relevant to this complaint. Inmates must first attempt to informally resolve a grievable issue within two business days of becoming aware of the issue, unless prevented by circumstances beyond his or her control. *Id*. at ¶ Q. If informal resolution is unsuccessful, the inmate may proceed to Step I of the grievance process and submit a completed grievance form within five business days of the attempted informal resolution. *Id*. at ¶¶ Q, W. The inmate submits the grievance to a designated Grievance Coordinator, who assigns it to a respondent. *Id*. at ¶ W. The Policy Directive also provides the following directions for completing grievance forms: "The issues should be stated

briefly but concisely. Information provided is to be limited to the facts involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included." *Id.* at ¶ S (emphasis in original).

If the inmate is dissatisfied with the Step I response, or does not receive a timely response, he may appeal to Step II by obtaining an appeal form within ten business days of the response, or if no response was received, within ten days after the response was due. MDOC Policy Directive 03.02.130 at ¶¶ U, DD. The respondent at Step II is designated by the policy, *e.g.,* the regional health administrator for medical care grievances. *Id.* at ¶ FF.

If the inmate is still dissatisfied with the Step II response, or does not receive a timely Step II response, he may appeal to Step III using the same appeal form. *Id.* at ¶¶ U, HH. The Step III form shall be sent within ten business days after receiving the Step II response, or if no Step II response was received, within ten business days after the date the Step II response was due. *Id.* The Grievance and Appeals Section is the respondent for Step III grievances on behalf of the MDOC director. *Id.* at ¶ II.

When the grievance procedures are not available because the issue presented is non-grievable, exhausting those procedures is not required. It is well-established that a prisoner "cannot be required to exhaust administrative remedies regarding non-grievable issues." *Figel v. Bouchard*, 89 F. App'x 970, 971 (6th Cir. 2004); *Mays v. Kentucky Dept. of Corrections*, 2018 WL 4603153, at *3 (W.D. Ky. Sept. 25, 2018) ("It is beyond debate that an inmate cannot be required to exhaust administrative

remedies regarding non-grievable issues."); *Reeves v. Hobbs,* 2013 WL 5462147, at *6 (W.D. Ark. Sept. 3, 2013) ("Defendants cannot treat a complaint as non-grievable, and therefore not subject to the grievance procedure, and then turn around and maintain the claim fails because [the plaintiff] failed to follow the grievance procedure. As the well-known proverb states, they cannot have their cake and eat it too."). However, when other administrative remedies are available, the prisoner is required to exhaust those remedies prior to filing a federal lawsuit.

## VI.  Analysis

Each Plaintiff purports to set forth the following claims against Defendants based on their deployment of chemical agents and subsequent refusal to provide Plaintiffs with medical attention: (1) retaliation, in violation of the First Amendment, (2) deliberate indifference to their serious medical needs, in violation of the Eighth Amendment, and (3) civil conspiracy. Each Plaintiff further purports to set forth a retaliation claim against Defendants for cutting off Plaintiffs' access to their phones and JPay accounts.

As an initial matter, the undersigned notes that the circumstances surrounding Plaintiffs' claims are unique. All Plaintiffs were housed in administrative segregation during the incidents underlying this case. (ECF No. 50-1, PageID.498-509 (Plaintiffs' Affidavits).) And Plaintiffs claim that Defendants violated their individual constitutional rights at the same time and in the same manner. As such, Defendants bore the burden of identifying the available administrative remedy for prisoners in administrative segregation to exhaust

13

overlapping claims and proving that Plaintiffs did not exhaust those remedies. *Jones*, 549 U.S. 199, 212-16 (2007).  The undersigned concludes that Defendants have not met their burden.

Defendants first contend that Plaintiffs Witherspoon, Kelly, Thompkins, Regains, McCoy, Thomas, A. Taylor, Stovall, Webb, and Dorsey were required to appeal their grievances through Step III of the grievance process after they were rejected as non-grievable.  (ECF No. 49, PageID.489.)  This Court has repeatedly rejected Defendants' position; when a prisoner's claim is rejected as non-grievable, the prisoner is not required to exhaust the MDOC's grievance process prior to filing suit.  *Valdez v. Bray*, No. 2:21-CV-58, 2022 WL 3587883, at *4 (W.D. Mich. July 22, 2022), *report and recommendation adopted*, No. 2:21-CV-58, 2022 WL 3586244 (W.D. Mich. Aug. 22, 2022) ("[F]or the MDOC to instruct a prisoner that his claims fall outside of its grievance procedure and then assert that the claims are barred from litigation because the prisoner did not exhaust the same procedure belies logic."); *Kelly v. Labelle*, No. 2:20-CV-00049, 2021 WL 2419569, at *5 (W.D. Mich. May 12, 2021), *report and recommendation adopted*, No. 2:20-CV-49, 2021 WL 2417104 (W.D. Mich. June 14, 2021) (opining that by rejecting the plaintiff's grievance as non-grievable and then asserting that the plaintiff failed to appeal his grievance, the MDOC placed the plaintiff in a "proverbial 'Catch-22' situation").

Defendants next contend that Plaintiffs were required to raise their claims at the Warden's Forum as set forth in MDOC P.D. 04.01.150 after their grievances were rejected.  (ECF No. 49, PageID.489.)    In the opinion of the undersigned, there are

genuine issues of fact as to whether MDOC P.D. 04.01.150 applied to Plaintiffs' claims, and whether Plaintiffs failed to comply with the provision.

Plaintiff's say that their grievances were rejected under MDOC P.D. 03.02.130 ¶ J(7) or MDOC P.D. 03.02.130 ¶ J(8). (*See, e.g.*, ECF No. 45-1, PageID.498 (Dorsey Step I Rejection); ECF No. 45-1, PageID.453 (A. Taylor Affidavit).) Those provisions are shown below.

> 8. The prisoner is grieving <u>content</u> of the policy or procedure except as it was specifically applied to the grievant. If a prisoner has a concern with the content of a policy or procedure, s/he may direct comments to the Warden's
>
> 7. Two or more prisoners and/or parolees have jointly filed a single grievance regarding an issue of mutual impact or submit identical individual grievances regarding a given issue as an organized protest.
> Forum as provided in PD 04.01.150 "Prisoner Housing Unit Representatives/Warden's Forum."

As set forth in these provisions, MDOC policy does not direct prisoners to MDOC P.D. 04.01.150, or any alternative remedy, when their claims are identical to those set forth in a grievance previously filed by another prisoner. MDOC P.D. 03.02.130 ¶ J(7). It only directs prisoners to MDOC P.D. 04.01.150 when their claims pertain to "the content of a policy or procedure except as it is specifically applied to the grievant." MDOC P.D. 03.02.130 ¶ J(8). This distinction seems reasonable. If a prisoner's grievance is rejected as identical to another prisoner's grievance, logic dictates that the original grievance placed the MDOC on notice of the shared claims. But if the grievance is rejected at Step I for concerning the contents of a policy directive, the MDOC has not received the same notice. And one of the purposes of the exhaustion requirement is to provide the MDOC with notice and the opportunity to resolve a prisoner's claims prior to litigation. *See Porter*, 534 U.S. at 525.

Here, Plaintiffs claim that Defendants violated their individual First and Eighth Amendment rights, albeit simultaneously. This Court has previously determined that MDOC P.D. 03.02.130 ¶ J(8) does not apply when a prisoner grieves a violation of their individual constitutional rights. *Lopp v. Washington*, No. 1:19-CV-540, 2021 WL 3033266, at *2 (W.D. Mich. July 19, 2021) (explaining that a claim pertaining to a grievant's specific, constitutional rights does not fall within MDOC P.D. 03.02.130 ¶ J(8)). Moreover, Defendants concede that Plaintiffs C. Taylor and Wallace exhausted grievances concerning Plaintiffs' claims. (ECF No. 40, PageID.306-307.) It follows that additional grievances concerning Plaintiffs' claims would have been identical. As such, it appears that the claims of Plaintiffs Witherspoon, Kelly, Thompkins, Regains, McCoy, Thomas, A. Taylor, Stovall, Webb, and Dorsey fell squarely within MDOC P.D. 03.02.130 ¶ J(7), and that they were not required to exhaust their claims via MDOC P.D. 04.01.150.

But even if MDOC P.D. 04.01.150 clearly applied, Defendants have not met their burden of establishing that Plaintiffs failed to exhaust this remedy. MDOC P.D. 04.01.150(A) is shown below.

> **GENERAL INFORMATION**
>
> A. This policy applies only to general population housing units for security Level I through V prisoners. In other units, prisoners should contact their Resident Unit Manager (RUM) with concerns regarding conditions of confinement that affect groups of prisoners or the entire unit. If the RUM cannot resolve the concerns, they shall submit them to the appropriate Assistant Deputy Warden (ADW). If the concern cannot be resolved by the ADW, they shall submit the concerns to the Deputy Warden. If the concern cannot be resolved by the Deputy Warden, they shall refer the matter to the Warden for resolution.

Defendants repeatedly assert throughout their reply brief that Plaintiffs did not raise their issues at the Warden's Forum. (ECF No. 49, PageID.491.) But MDOC P.D.

04.01.150(A) specifically excludes prisoners in administrative segregation from participation in the Warden's Forum. Instead of raising concerns at the Warden's Forum, it instructs prisoners outside of the general population housing units to submit "concerns regarding conditions of confinement that affect groups of prisoners or the entire unit"[9] to their Resident Unit Manager (RUM), then their Assistant Deputy Warden, and finally their Warden. *Id.* Nowhere in Defendants' briefs or accompanying documents does it state that Plaintiffs failed to raise their concerns as set forth in MDOC P.D. 04.01.150(A). And it is Defendants' burden to establish that there are no genuine issues of material fact on this point.

Accordingly, the undersigned finds that there are genuine issues of material fact as to the availability and exhaustion of MDOC P.D. 04.01.150.

## VII.   Recommendation

The undersigned respectfully recommends that the Court deny Defendants' motion for summary judgment because there are genuine issues of fact concerning whether MDOC P.D. 04.01.150 was available to Plaintiffs Witherspoon, Kelly, Thompkins, Regains, McCoy, Thomas, A. Taylor, Stovall, Webb, and Dorsey, and whether they exhausted the remedies set forth therein.

---

[9]   Notably, MDOC P.D. 03.02.120 does not contain a corresponding provision classifying all claims affecting a group of prisoners as non-grievable. After all, Plaintiffs C. Taylor and Wallace exhausted their claims through the grievance procedure. The provisions therefore seem to overlap, creating additional confusion as to when prisoners must exhaust via MDOC P.D. 04.01.150.

If the Court accepts this recommendation, all of Plaintiffs' claims will remain.


Dated:   October 5, 2022                              /s/ *Maarten Vermaat*
                                                     MAARTEN VERMAAT
                                                     U. S. MAGISTRATE JUDGE


**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).