UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

NORWOOD WITHERSPOON, et al.,                    Case No. 2:21-cv-40

               Plaintiffs,                    Hon. Robert J. Jonker
                                           U.S. District Judge

     v.

UNKNOWN BINNER, et al.,

               Defendants.
_____/

## **REPORT AND RECOMMENDATION**

### I.    **Introduction**

This Report and Recommendation (R. & R.) addresses Defendants' motion for summary judgment (ECF No. 91).  It further addresses Plaintiffs' failure to serve Defendant Beminster in accordance with Federal Rule of Civil Procedure 4(m).

Plaintiffs[1] filed suit pursuant to 42 U.S.C. § 1983 on March 2, 2021.  After their cases were severed (ECF No. 15), and then reconsolidated (ECF No. 30), Plaintiffs filed an amended complaint asserting that while they were confined at Marquette Branch Prison (MBP) in Marquette, Michigan, MBP employees[2] conspired against

---

[1]    At this stage of the case, Plaintiffs include the following state prisoners: (1) Norwood Witherspoon, #484291, (2) Devonte Dorsey, #967089, (3) Michael Kelly, #781124, (4) Demetric Thompkins, #575337, (5) Jabari Regains, #600539, (6) Christopher Michael Taylor, #408375, (7) Jaylen McCoy, #793044, (8) Keith Thomas, #436056, (9) Antonio Taylor, #618544, (10) Anthony Wallace, #705595, (11) Larry Stovall, #601852, and (12) Oliver Webb, VI, #283528.

[2]    At this stage of the case, Defendants include: (1) Corrections Officer (CO) Unknown Binner, (2) CO Unknown Miller, (3) Sergeant (Sgt.) Unknown Wittler (spelled "Whitlar" in the amended complaint), (4) Sgt. Unknown Beminster, (5) CO

them and violated their First, Eighth, and Fourteenth Amendment rights (ECF No. 37, PageID.285-288).

Specifically, Plaintiffs alleged that they were transferred to MBP following a major disturbance in their housing unit at Chippewa Correctional Facility (URF) in Kincheloe, Michigan. (*Id.*, PageID.270.) Shortly after arriving at MBP, Plaintiffs began testing positive for COVID-19 and complaining about the conditions in the facility. (*Id.*, PageID.271-272.) Plaintiffs say that while they were suffering from COVID-19 on October 20, 2020, Defendants authorized or participated in the excessive deployment of chemical agents during a cell extraction in their MBP housing unit. (*Id.*, PageID.273-277.) Defendants then refused to air-out the unit or provide Plaintiffs with medical care related to their exposure to chemical agents. (*Id.*) Plaintiffs assert that Defendants deployed the chemical agents and refused to provide them with proper ventilation or medical care based on either the URF disturbance, or Plaintiffs' complaints upon arriving at MBP. (*Id.*)

Defendants now move for summary judgment. (ECF No. 91.) Defendants say that Plaintiffs' account of the October 20, 2020, incident constitutes nothing more than a "visible fiction." (ECF No. 99, PageID.1080.) Defendants did not conspire to violate Plaintiffs' constitutional rights. Instead, they deployed a chemical agent against a non-party inmate on October 20, 2020, in a good-faith effort to restore

---

Chris Lamentola, and (6) Warden Erica Huss. Though Sgt. Beminster is mentioned in some of the docket entries in this case, it appears that Sgt. Beminster was never served. (*See* ECF No. 41, PageID.398, 401 (returning the summons unexecuted).) As such, Sgt. Beminster does not join in the pending motion for summary judgment.

discipline.  (ECF No. 92, PageID.711-717.)  Defendants intentionally deployed pepper balls rather than pepper spray in order to minimize the effect of the chemical agent on Plaintiffs' housing unit at large.  (*Id.*, PageID.725-726.)  And Defendants say that they did not deny Plaintiffs adequate ventilation or medical care after the deployment of the chemical agent.  (*Id.*, PageID.717-724)  Nor did they take or refuse to take any action in an effort to retaliate against Plaintiffs.  (*Id.*, PageID.728-734.)

The undersigned respectfully recommends that the Court grant Defendants' motion for summary judgment.  In the undersigned's opinion, there are no genuine issues of material fact.  The evidence on the record establishes that Defendants conducted the October 20, 2020, cell extraction after an inmate assaulted a staff member by throwing human waste through the bars of his cell.  The evidence further establishes that Defendants were not deliberately indifferent to Plaintiffs' COVID-19 status during Smith's extraction, but rather considered the Plaintiffs' COVID-19 status and specifically utilized pepper balls rather than an aerosol spray in order to mitigate the spread of the agent throughout the housing unit.

With respect to Plaintiffs' claim that Defendants refused them medical care and proper ventilation in deliberate indifference to their serious medical needs, it is the undersigned's opinion that Plaintiffs' alleged symptoms were those typically associated with exposure to chemical agents, and did not rise to the level of obvious, serious medical needs.  Moreover, Plaintiffs' medical records show that they either received or refused medical care shortly after the October 20, 2020, incident.  And

Plaintiffs have not provided evidence that any delay between their requests and receipt of medical care was detrimental to their health.

Turning to Plaintiffs' retaliation claim, the undersigned notes that Plaintiffs' alleged participation in the URF disturbance does not constitute protected conduct. And though Plaintiffs' complaints and grievances about the conditions of their housing unit at MBP do constitute protected conduct, Plaintiff Regains is the only Plaintiff to assert that Defendants' conduct was motivated by Plaintiffs' grievances, and his only evidence of that motivation is Defendant Lamentola's statement that "You guys like complaining and writing grievances, well there you go."  But Defendant Lamentola was not a part of the Emergency Response Team (ERT) that deployed the pepper balls on October 20, 2020, and Plaintiffs seem to concede that Lamentola turned fans on and opened windows after the pepper balls were deployed. As such, Defendant Lamentola did not take any adverse actions against Plaintiffs.

And with respect to Plaintiffs' claim of civil conspiracy, Plaintiffs have provided no evidence of a single plan or that Defendants shared a conspiratorial objective to violate their constitutional rights.

Finally, the undersigned recommends that the Court dismiss Defendant Beminster in accordance with Federal Rule of Civil Procedure 4(m) unless Plaintiffs can establish good cause for their failure to identify Defendant Beminster after the initial summons was returned to the U.S. Marshals Service unexecuted.

## II.    Background

Both Plaintiffs and Defendants provide accounts of the events leading up to and following the October 20, 2020, incident.  Those accounts, which are summarized below, are consistent in some respects and inconsistent in others.

### a.    Plaintiffs' Sworn Statements

According to Plaintiffs, they were transferred to MBP in September of 2020 after a disturbance broke out in their housing unit at URF.  To accommodate the transfers, Plaintiff Wallace says that MBP opened a housing unit that had previously been closed due to black mold.  (ECF No. 98-4, PageID.1062 (Wallace Dep. 23:9-23:13).)  And Wallace says that there were also dead animals in the housing unit when they arrived.  (*Id.* (Wallace Dep. 23:14-23:16).)  Wallace says that inmates in the housing units began filing grievances based on these conditions.  (*Id.* (Wallace Dep. 23:17).)  Plaintiff Webb states that the inmates complained to Defendant Warden Huss about the conditions of the housing unit.  (ECF No. 98-6, PageID.1078 (Webb Dep. 17:4-17:11).)

At some point prior to October 19, 2020, Plaintiffs all contracted COVID-19.  During the late-night hours of October 19, 2020, Plaintiffs say that MBP staff began having issues with a non-party inmate in their housing unit.  Plaintiff Wallace says that the inmate was accused of assaulting a staff member.  (ECF No. 98-4, PageID.1059 (Wallace Dep. 9:23-9:25).)  Plaintiff Webb says that the inmate threw something at the staff member, "drenching" him.  (ECF No. 98-6, PageID.1075 (Webb Dep. 8:14-8:18).)  Webb says that after the assault, officers came to the inmate's cell

5

and told him to "cuff up" so that they could take him to segregation.[3] (*Id.* (Webb Dep. 8:18-8:20).) But the inmate refused, and the officers left. Then, in the early morning hours of October 20, 2020, a team of officers came to extract the inmate.

Some of the plaintiffs say that they spoke to the staff assigned to their unit prior to the move team arriving for the extraction. Plaintiff Regains says that he specifically remembers talking to Defendant CO Binner about the use of chemical agents, and that she ignored him. (ECF No. 98-2, PageID.1042 (Regains Dep. 18:7-18:18).) Plaintiff Witherspoon says after the move team entered the housing unit, he informed the team that he was severely asthmatic and that he was suffering from COVID-19 and pleaded with them not to use chemical agents. (ECF No. 98-1, PageID.1029 (Witherspoon Dep. 14:20-14:25).) At that point, Regains says that "everybody was yelling" and telling the move team not to use chemical agents because they had COVID-19. (ECF No. 98-2, PageID.1042 (Regains Dep. 20:18-20:20).) Plaintiff Kelly says that he also has asthma, but that he did not have the opportunity to tell staff about his asthma prior to the extraction. (ECF No. 98-5, PageID.1070-1071 (Kelly Dep. 20:6-21:14).)

None of the plaintiffs could see the extraction. But the plaintiffs who could hear the extraction say that they heard the move team fire as many as fifteen pepper balls before successfully extracting the inmate. Plaintiff Witherspoon said that he could hear the hissing of gas cannisters in addition to the pepper balls. (ECF No. 98-

---

[3]    In contrast, Plaintiff Wallace says that the move team did not give the inmate the opportunity to comply before deploying the chemical agent. (ECF No. 98-4, PageID.1060 (Wallace Dep. 16:15-16-25).)

1, PageID.1028 (Witherspoon Dep. 9:8-9:16).)  Plaintiffs say that they felt the effects of the chemical agent within minutes, including burning sensations in their eyes and lungs, shortness of breath, chest pains, and vomiting.  (ECF No. 98-1, PageID.1029 (Witherspoon Dep. 13:14-13:20); ECF No. 98-2, PageID.1043 (Regains Dep. 21:24-22:8); ECF No. 98-3, PageID.1051-1052 (Stovall Dep. 14:21-13:8); ECF No. 98-4, PageID.1060-1061 (Wallace Dep. 13:3-13:8, 18:10-18:14); ECF No. 98-5, PageID.1069 (Kelly Dep. 14:7-14:15); ECF No. 98-6, PageID.1077 (Webb Dep. 13:2-13:15).)

According to Plaintiffs, the cells in their housing unit were connected by vents, which caused further disbursement of the chemical agent into their cells.[4]  (ECF No. 98-1, PageID.1033 (Witherspoon Dep. 31:12-31:17); ECF No. 98-2, PageID.1041 (Regains Dep. 15:10-15:12); ECF No. 98-3, PageID.1050 (Stovall Dep. 12:11-12:13); ECF No. 98-4, PageID.1060 (Wallace Dep. 13:3-13:4).)   Plaintiffs say that they asked MBP staff to take mitigating actions, including opening windows, turning on fans, or opening the unit doors in order to better ventilate the housing unit. (ECF No. 98-1, PageID.1033 (Witherspoon Dep. 30:17-31:11); ECF No. 98-2, PageID.1044 (Regains Dep. 26:3-26:6); ECF No. 98-3, PageID.1053 (Stovall Dep. 22:11-22:25); ECF No. 98-4, PageID.1061 (Wallace Dep. 20:4-20:10); ECF No. 98-6, PageID.1076 (Webb Dep. 9:14-9:16).)  But for the most part, Plaintiffs say that Defendants ignored their requests, with the exception of Defendant CO Miller who told Regains that staff had

---

[4]    Though it is worth noting that when asked how he knew that all of the vents were connected, Plaintiff Regains admitted that he did not "know for sure" but that he assumed the vents were connected because the inmates used the vents to talk to one another.  (ECF No. 98-2, PageID.1041 (Regains Dep. 15:20-16:3).)

turned on the unit's shower fans.  (ECF No. 98-2, PageID.1044 (Regains Dep. 27:3-27:9).)

Plaintiffs also say that they requested medical care following their exposure to the chemical agents.  Some of the plaintiffs report that they received no medical attention after their exposure.  (ECF No. 98-1, PageID.1030 (Witherspoon Dep. 19:22-19:24, 24:3-24:6).)  Others report that nurses conducted rounds in the unit every day, but that the rounds entailed nothing more than the nurses looking into their cell as they passed by.  (ECF No. 98-2, PageID.1040 (Regains Dep. 11:13-11:24); (ECF No. 98-4, PageID.1063 (Wallace Dep. 26:11-26:16); ECF No. 98-5, PageID.1070 (Kelly Dep. 17:14-18:5).)  And others still report that once every few days, nurses would come and place a device on their fingers in order to monitor their COVID-19 symptoms.  (ECF No. 98-2, PageID.1040 (Regains Dep. 11:25-12:8); ECF No. 98-3, PageID.1051 (Stovall Dep. 15:13-16:6); ECF No. 98-4, PageID.1063 (Wallace Dep. 25:19-25:23); ECF No. 98-6, PageID.1077 (Webb Dep. 15:8-15:13).)  But Plaintiffs seem to agree that they were not provided medical care upon request following the October 20, 2020, use of chemical agents.  Plaintiffs Stovall, Wallace, and Kelly report that when they asked to see health care related to the chemical agents, the officers in their housing unit, including CO Binner, just told them to put in a medical kite or a grievance.  (ECF No. 98-3, PageID.1052 (Stovall Dep. 18:7-18:12); ECF No. 98-4, PageID.1060 (Wallace Dep. 13:8-13:17); ECF No. 98-5, PageID.1069 (Kelly Dep. 15:11-15:17).)

Some of the plaintiffs state that the move team used chemical agents on October 20, 2020, to retaliate against them for their alleged participation in the URF disturbance. (ECF No. 98-3, PageID.1054 (Stovall Dep. 28:12-28:17); ECF No. 98-4, PageID.1059 (Wallace Dep. 9:15-9:18); ECF No. 98-6, PageID.1076 (Webb Dep. 9:4-9:17).) Others say that it was for grievances and complaints they made upon arriving at MBP. (ECF No. 98-2, PageID.1044 (Regains Dep. 26:15-26:19).)

Plaintiff Wallace says that even before the cell extraction, MBP staff had been retaliating against Plaintiffs for the URF disturbance. (ECF No. 98-4, PageID.1059 (Wallace Dep. 9:15-9:18).) And Wallace says that when he stopped Defendants CO Lamentola, CO Miller, CO Binner, and Sgt. Wittler for help after the extraction, they each told him to write a grievance, and that he should not have participated in the URF disturbance. (*Id.*, PageID.1062 (Wallace Dep. 22:6-22:14).) Plaintiff Wallace says that when he complained to non-party Prison Counselor (PC) Rebecca Horrocks[5] about the use of chemical agents, she told him the same, and then began "taking [Wallace]'s phone calls."

Plaintiff Regains says that the morning after the cell extraction, he spoke with CO Lamentola about the use of chemical agents in the housing unit. Lamentola allegedly stated: "You guys like complaining and writing grievances, well there you go." (ECF No. 98-2, PageID.1044 (Regains Dep. 26:15-26:19).) Sometime after the

---

[5]    Plaintiffs named PC Horrocks as a defendant in their June 24, 2022, amended complaint. (ECF No. 37, PageID.269.) However, PC Horrocks is not listed as a defendant in the docket, and it does not appear that Plaintiffs ever served her with a copy of their amended complaint.

extraction, Plaintiffs Witherspoon and Regains say that they discussed the use of chemical agents with Warden Huss.  But Huss just responded that Plaintiffs would not have found themselves in that situation had they not participated in the disturbance at URF.  (ECF No. 98-1, PageID.1033 (Witherspoon Dep. 32:8-32:21); ECF No. 98-2, PageID.1044 (Regains Dep. 28:3-28:10).)

Plaintiffs say that they are still experiencing pain, headaches, difficulties breathing, and mental health issues to this day that they believe were caused by the use of chemical agents on October 20, 2020.    (ECF No. 98-1, PageID.1030 (Witherspoon Dep. 18:6-18:11); ECF No. 98-2, PageID.1043 (Regains Dep. 22:17-22:22); ECF No. 98-3, PageID.1052 (Stovall Dep. 19:21-20:9); ECF No. 98-4, PageID.1061 (Wallace Dep. 18:10-18:17); ECF No. 98-6, PageID.1077 (Webb Dep. 15:24-16:4).)

### b.  Defendants' Sworn Statements

Sgt. Wittler provided an affidavit along with Defendants' motion for summary judgment.    The remaining defendants provided excerpts of their deposition testimony.  Defendants also provided affidavits from the Training Division Support Section Manager of the MDOC, explaining the differences between pepper balls and aerosol sprays, as well as an affidavit from the Physical Plant Supervisor at MBP, explaining the structure and function of the ventilation at MBP.

Defendants say that in the late hours of October 19, 2020, a  C-Block inmate by the name of Smith assaulted an officer by throwing human waste through the bars of his cell.  (ECF No. 92-5, PageID.784 (Wittler Aff.).)  Because Smith had assaulted

an officer through the bars of his cell, staff decided to move Smith to a segregation cell with a plexiglass front.  (*Id.*)  Sgt. Wittler says that he approached Smith's cell and asked him to come to the front of the cell in order to be restrained and moved.  Smith refused.  Staff therefore sought approval for an Emergency Response Team (ERT) to extract Smith from his cell and move him to segregation.  (*Id.*)  Non-party Deputy Warden Doug Tasson approved the ERT at approximately 11:44 p.m. on October 19, 2020.  (*Id.*)  Warden Huss was not working at the time.  (ECF No. 92-17, PageID.986 (Huss Dep. 6:3-6:14).)

Defendants say that before the ERT assembled, staff discussed the potential use of chemical agents in a unit that housed prisoners with COVID-19.  (ECF No. 92-5, PageID.784-785.)  Staff decided that if they had to utilize chemical agent, they would opt for pepper balls over aerosol spray in order to minimize the impact of the agent on the rest of the housing unit.  (*Id.*, PageID.785; ECF No. 92-17, PageID.988 (Huss Dep. 29:9-30:17).)  Defendants say that a pepper ball launcher is similar to a paintball gun, and that pepper balls are similar to paint balls.  (ECF No. 92-8, PageID.829 (Lamentola Dep. 18:2-18:7).)  Each time the trigger of the launcher is pulled, one pepper ball is fired from the launcher.  But sometimes, the launcher will misfire.  (*Id.*, PageID.830 (Lamentola Dep. 19:7-19:15).)  When the launcher misfires, it makes a sound but does not discharge a pepper ball.  (*Id.*)

In his affidavit, Training Division Support Section Manager Jeremy LaBelle confirms that:

> One of the reasons pepper balls may be used rather than aerosol sprays is that typically, there is less cross contamination throughout the area

11

> the chemical agent is used when using pepper balls as opposed to using aerosol chemical agents. Each pepper ball (.69 inch in size) contains a powdered chemical agent that is dispersed when the ball breaks from hitting an object or person. The powder particulate is heavier than an aerosol delivery method and typically falls to the ground faster, thus preventing a wider spread of the chemical. In a prison facility that has an open bar setting rather than solid doors, pepper balls would be a good choice in trying to prevent contaminating a larger area.

(ECF No. 92-9, PageID.859 (Labelle Aff.).) Labelle also explains that using a chemical agent during a cell extraction is preferable to having staff physically enter the cell because although it causes discomfort, it reduces the risk of injury to both the prisoner and the prison staff. (*Id.*, PageID.860-861.)

Defendants say that the ERT was assembled at 1:55 a.m. on October 20, 2020. As the commanding officer, Sgt. Wittler first approached Smith's cell and ordered him to come to the front of the cell in order to be restrained and moved. (ECF No. 92-5, PageID.785.) When Smith did not comply, Wittler ordered non-party CO Litzner to deploy the pepper balls. Litzner then fired four pepper balls into Smith's cell, leading Smith to comply with the ERT's instructions. (*Id.*; ECF No. 92-13, PageID.906 (Miller Dep. 21:24-21:25).)

Defendants say that they were not aware of any C-Block inmates who were considered high-risk for chemical agent exposure. (ECF No. 92-5, PageID.92-5, PageID.786.) In fact, some of the defendants say that they were not aware that the inmates in C-Block had tested positive for COVID-19. (ECF No. 92-13, PageID.902 (Miller Dep. 17:6-17:8).) After they deployed the pepper balls, the only inmate whom Defendants observed reacting to the agent was Smith. (ECF No. 92-5, PageID.786; ECF No. 92-13, PageID.899 (Miller Dep. 14:10-14:12).) CO Lamentola says that he

12

heard prisoners complaining about the use of chemical agents after the extraction, but that none of the prisoners appeared to require medical attention. (ECF No. 92-8, PageID.824-825 (Lamentola Dep. 13:12-14:8).)  Furthermore, CO Lamentola, who was working in the unit and was not wearing a gas mask, did not experience any effects of the chemical agent himself. (*Id.*, PageID.824 (Lamentola Dep. 13:2-13-8).)

CO Lamentola says that he turned on shower fans and opened windows after the cell extraction in order to ventilate the unit. (*Id.*, PageID.832-835 (Lamentola Dep. 21:23-24:6).)  He also says that staff opened the door into the unit. (*Id.*, PageID.835 (Lamentola Dep. 24:7-24:10).)  Furthermore, MBP Physical Plant Supervisor Sean Sundholm explains that:

> In C Block at MBP, each individual cell has an exhaust vent at the back of the cell. This vent draws air from outside of the cell front through the cell and exhausts it to the outside of the housing unit. There is a make up air unit in the attic whereby the system draws 100% fresh air from outside the housing unit, warms it to ambient room temp, and supplies it into the commons area of the building.
>
> No air is drawn from one cell and then circulated directly or indirectly into another cell through the heating and ventilation system.

(ECF No. 92-10, PageID.865 (Sundholm Aff.).)

Defendants say that they were not aware of any of Plaintiffs' complaints regarding the conditions of MBP prior to serving on the ERT. (*See* ECF No. 92-5, PageID.786; ECF No. 92-8, PageID.843-844 (Lamentola Dep. 32:20-33:6).)  Some of the defendants say that they were not even aware of the URF disturbance that led to Plaintiffs transfer to MBP. (ECF No. 92-8, PageID.843-844 (Lamentola Dep. 32:20-33:6).)  And Defendants deny mocking, ridiculing, or otherwise telling Plaintiffs that

they should not have participated in the URF disturbance or filed grievances at MBP. (ECF No. 92-13, PageID.915 (Miller Dep. 29:15-30:9); ECF No. 92-17, PageID.990 (Huss Dep. at 46:21-46:24).)

### c. Video Recording of the October 20, 2020, Incident

In addition to their sworn statements, Defendants provided the Court with video footage of the October 19, 2020, assault (Defs.' Ex. A-1) and the October 20, 2020, cell extraction (Defs.' Exs. A-2, A-3).

### i. October 19, 2020, Surveillance Footage (Defs Ex. A-1)

In the beginning of the October 19, 2020, surveillance footage, a CO is seen completing rounds on the second level of C-Block. (Defs.' Ex. A-1 at 00:07.) As the CO passes the third cell on the second level, the inmate inside the cell throws a significant amount of liquid out at the staff member. (*Id.* at 00:10-00:13.) After the CO stops walking, the inmate proceeds to throw a plastic cup out of his cell, striking the CO directly in the head. (*Id.* at 00:16-00:19.) The cup lands near the door of the inmate's cell.

After he is struck by the cup, the CO stops his round and pulls out his radio, appearing to contact other staff.[6] (*Id.* at 00:20-00:36.) The CO then stands outside of the cell, as the inmate appears to continue kicking and tossing the cup towards the CO. (*Id.* at 00:36-1:14.) Additional staff arrive soon thereafter, beckon the CO to follow them, and proceed to walk down the unit and out of frame. (*Id.*, PageID.115-1:36.)

---

[6]     The surveillance footage does not have any audio.

14

### ii. <u>First</u> Handheld Video Footage from October 20, 2020 (Defs. Ex. A-2)

The first handheld video footage lasts only a minute.  It begins with Sgt. Wittler identifying the date as October 20, 2020, and the time as 1:42 a.m. (Defs.' Ex. A-2 at 00:00-00:05.)  Wittler explains that an ERT has been approved by Deputy Warden Doug Tasson in order to extract inmate Smith from his cell for assaulting staff.  (*Id.* at 00:06-00:24.)  Wittler provides that inmate Smith is a normal risk for the use of chemical agents.  (*Id.* at 00:25-00:30.)  The other members of the ERT then identify themselves, including: (1) CO Campbell on shield, (2) CO Hope on hand restraints, (3) CO Andrzejak on leg restraints, (4) CO Litzner on breacher number one, (5) CO Miller on breacher number two, and (6) CO Kautz on video recorder.  (*Id.* at 00:31-01:00.)

### iii. <u>Second</u> Handheld Video Footage from October 20, 2020 (Defs. Ex. A-3)

The second handheld video begins with the ERT moving up the stairs to the front of Smith's cell in C-Block.  (Defs.' Ex. A-3 at 00:00-00:12.)  Inmate Smith is seen laying in his bunk.  (*Id.* at 00:21-00:26.)  Sgt. Wittler approaches Smith and identifies himself, obstructing the camera's view of Smith.  Wittler directs Smith to come to his cell front and "allow the application of restraints."  (*Id.* at 00:32-00:37.)  Wittler informs Smith that his failure to do so will result in the use of a pepper ball launcher. (*Id.* at 00:38-00:41.)  Wittler repeats the instruction and warning twice.  (*Id.* at 00:41-01:00.)

At this point, C-Block inmates begin to yell louder and louder.  A nearby prisoner yells something to the effect of: "Hey hey hey.  We've got COVID."  (*Id.* at 01:00-01:05.)   After several bangs, presumably emanating from the pepper ball launcher, another prisoner yells that Smith takes medicine to sleep.  (*Id.* at 01:07-01:20.)  The launcher fires several more times.  (*Id.* at 01:13-01:22.)  But though the shots are audible, Sgt. Wittler stands between the handheld recorder and Smith's cell.  As such, the video does not show the pepper balls entering Smith's cell.

Smith eventually rises from his bunk and approaches the cell door.  (*Id.* at 01:31-01:35.)  He turns around and allows the ERT to restrain him through his cell door.  (*Id.* at 01:32-02:55.)  ERT members then open Smith's cell door and remove him from his cell.  (*Id.* at 03:00-03:43.)  Smith is audibly coughing.  Other C-Block inmates continue to yell and bang on their cell doors.  The ERT escorts Smith down the stairs and places him in a restraint chair.  (*Id.* at 03:45-05:51.)  The ERT then wheels Smith out of C-Block and into another cell in another housing unit.  (*Id.* at 05:59-11:30.)

Shortly thereafter, staff remove Smith's handcuffs through the bars of the new cell.  (*Id.* at 11:40-12:22.)  Smith coughs more as his handcuffs are removed.  Members of the ERT tell Smith to strip and bend over.  (*Id.* at 12:30-12:45.)  The footage then cuts to the time following the strip search.  Smith is standing with his hands restrained and connected to a tether.  (*Id.* at 12:47.)  Members of the ERT remove Smith from the cell.  (*Id.* at 13:25-13:35.)  They place Smith back in the restraint chair.  (*Id.* at 13:33-14:25.)

Once restrained, a nurse approaches Smith, taking his vitals and asking him a series of questions. (*Id.* at 14:30-15:14.) Though the nurse stands directly in front of the video camera, both her questions and Smith's responses are inaudible. The nurse then steps away from Smith and faces the camera. (*Id.* at 15:15-15:16.) She identifies herself as RN Hillier, and reports that Smith is stable, and that he wants to go back to his room. (*Id.* at 15:16-15:31.) ERT members begin wheeling Smith away, and the video recording ends. (*Id.* at 15:32-15:46.)

## III.    Relevant Procedural History

The procedural history of this case, at least for the year after it was filed, is extensive. Plaintiffs filed their initial complaint on March 2, 2021. (ECF No. 1.) Plaintiffs initially included the twelve aforementioned state prisoners as well as state prisoner Raymond Williams, #688523.[7]  On June 16, 2021, the Court severed Plaintiffs' claims into new, related actions. (ECF No. 15.) Although the Court recognized that Plaintiffs' claims could be joined under Fed. R. Civ. P. 20, the Court foresaw complications arising out of their status as pro se prisoners. (*Id.*, PageID.175-176.) For example, the Court noted that if even one Plaintiff was transferred to a different facility, Plaintiffs would be unable to provide pleadings signed by every plaintiff, as required by Fed. R. Civ. P. 11(a). (*Id.*, PageID.177.)

---

[7]    This Court granted the following Plaintiffs leave to proceed *in forma pauperis*: (1) Witherspoon, (2) Thompkins, (3) Williams, (4) Dorsey, (5) C. Taylor, (6) Wallace, and (7) Stovall. (ECF No. 6, PageID.112-115.) This Court denied the following Plaintiffs leave to proceed *in forma pauperis*: (1) Regains, (2) McCoy, (3) Thomas, (4) A. Taylor, (5) Webb, and (6) Kelly. (ECF No. 6, PageID.110-112; ECF No. 11, PageID.137.)

When the Court severed Plaintiffs claims, it ordered each individual Plaintiff to file amended complaints in their respective cases.  (*Id.*, PageID.179.)  When Williams failed to adhere to this order, the Court dismissed his case.  (W.D. Mich. Case No. 2:21-cv-141, ECF No. 19.)

On July 13, 2021, Witherspoon filed an amended complaint in accordance with the Court's orders.  (ECF No. 18.)  The Court then stayed the case and referred it to early mediation.  (ECF No. 21.)  On April 7, 2022, the Court removed this case from early mediation and ordered Witherspoon to provide the Court with copies of his complaint for service on each Defendant.  (ECF No. 26, PageID.238.)  Because Witherspoon proceeded *in forma pauperis*, the Court ordered service by the U.S. Marshals upon the Court's receipt of the requisite copies.

On March 22, 2022, attorney Ronnie Edward Cromer, Jr. appeared on behalf of Plaintiffs, and moved to consolidate the twelve remaining cases.  (ECF No. 27.) Because Plaintiffs were no longer proceeding pro se, the Court granted the motion and reconsolidated the cases.  (ECF No. 30, PageID.251.)  It is worth noting that prior to the reconsolidation of the cases, some of the cases were screened in accordance with 28 U.S.C. §§ 1915(e)(2), 1915A and 42 U.S.C. § 1997e(c).

The Court issued a screening opinion in Demetric Thomkins's case on November 19, 2021.  *Thompkins v. Binner*, No. 2:21-CV-138, 2021 WL 5410486, at *1 (W.D. Mich. Nov. 19, 2021).  The Court dismissed Thompkins's First Amendment retaliation and Eighth Amendment deliberate indifference claims.  *Id.* at *8.

18

On the same date, the Court issued a screening opinion in Michael Kelly's case. *Kelly v. Binner*, No. 2:21-CV-137, 2021 WL 5410488, at *1 (W.D. Mich. Nov. 19, 2021). Once again, the Court dismissed Kelly's First Amendment retaliation and Eighth Amendment deliberate indifference claims. *Id.* at *8.

On February 9, 2022, the Court issued a screening opinion in Oliver Webb's case. *Webb v. Binner*, No. 2:21-CV-147, 2022 WL 391317, at *1 (W.D. Mich. Feb. 9, 2022). In accordance with its screening opinions in *Thompkins* and *Kelly*, the Court dismissed Webb's First Amendment retaliation and Eighth Amendment deliberate indifference claims. *Id.* at *8.

## IV. Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

19

### a. Fourteenth Amendment

In their amended complaint, Plaintiffs allege that the excessive use of chemical agents, refusal to decontaminate their housing unit, and refusal to provide Plaintiffs with medical care related to the chemical agents violated their rights under the Fourteenth Amendment.  (ECF No. 37, PageID.285-286.)  Defendants argue these claims fall within the purview of the Eighth Amendment rather than the Fourteenth Amendment.  (ECF No. 92, PageID.710-711.)  Plaintiffs seem to concede to this point in their response to Defendants' motion, simply arguing that there are genuine issues of material fact precluding summary judgment on their Eighth Amendment claims of excessive force and deliberate indifference, and their First Amendment claim of retaliation.  (ECF No. 98, PageID.1015.)  Regardless, the undersigned agrees.

"Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'"  *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  The undersigned therefore analyzes Plaintiffs claims of excessive force and deliberate indifference under the Eighth Amendment.

### b. Eighth Amendment

The Eighth Amendment embodies a constitutional limitation on the power of the states to punish those convicted of a crime.  Punishment may not be "barbarous", nor may it contravene society's "evolving standards of decency."  *Rhodes v. Chapman*,

452 U.S. 337, 345-46 (1981); *see also Trop v. Dulles*, 356 U.S. 86, 101 (1958).  The Eighth Amendment also prohibits conditions of confinement which, although not physically barbarous, "involve the unnecessary and wanton infliction of pain." *Rhodes*, 452 U.S. at 346.

To establish an Eighth Amendment claim, a plaintiff must satisfy both an objective and a subjective component.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wilson v. Seiter*, 501 U.S. 294, 297-300 (1991).  "The objective component requires the pain inflicted to be 'sufficiently serious.'"  *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) (quoting *Wilson*, 501 U.S. at 298).  "The subjective component focuses on the state of mind of the prison officials."  *Id.* at 383.

The Eighth Amendment is violated when a prison official utilizes excessive force against an inmate.  *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986).  The essential inquiry for an Eighth Amendment claim of excessive force is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."  *Id.*  In making this inquiry, courts are guided by "such factors as the need for application of force, the relationship between the need and the amount of force that was used [and] the extent of injury inflicted."  *Id.* at 320-21 (alteration in original).

The Eighth Amendment is also violated when a prison official is deliberately indifferent to a substantial risk of serious harm to a prisoner.  *Farmer*, 511 U.S. at 834.  To satisfy the objective component, the plaintiff must show that he is incarcerated under conditions posing a substantial risk of serious harm.  *Id.*  To

satisfy the subjective component, the plaintiff must show that the defendant was aware of facts suggesting that a substantial risk of serious harm existed, and that the defendant actually surmised that a substantial risk of serious harm existed. *Mingus v. Butler*, 591 F.3d 474, 480 (quoting *Farmer*, 511 U.S. at 837). Deliberate indifference "entails something more than mere negligence," but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835.

Plaintiffs generally allege that Defendants violated their Eighth Amendment rights in two ways. First, Plaintiffs allege that Defendants violated their Eighth Amendment rights by utilizing chemical agents in the housing unit. (ECF No. 37, PageID.285-286.) Plaintiffs claim that Defendants either utilized excessive force by deploying the chemical agent with the intent of causing Plaintiffs harm, or deployed the chemical agent in deliberate indifference to the fact that Plaintiffs were suffering from COVID-19 at the time. (*Id.*) Second, Plaintiffs allege that Defendants violated their Eighth Amendment rights following the deployment of the chemical agent by ignoring their requests for ventilation, decontamination, and medical care in deliberate indifference to Plaintiffs' serious medical needs. (*Id.*, PageID.286-287.)

### i. Use of Chemical Agent

The undersigned first addresses Plaintiffs' claim that on October 20, 2020, Defendants either utilized force maliciously and sadistically to cause them harm, or in deliberate indifference to a substantial risk of serious harm considering their COVID-19 diagnoses. Although Plaintiffs readily admit that they were unable to see

the ERT extract inmate Smith from his cell on October 20, 2020, Plaintiffs attest that they heard the ERT fire a pepper ball launcher into Smith's cell as many as twelve times.  Plaintiffs argue that "this indiscriminate barrage despite Plaintiffs' audible COVID distress could allow a jury to infer malicious intent transcending good-faith discipline." (ECF No. 98, PageID.1018.)

Defendants' accounts of the October 20, 2020, extraction do not necessarily contradict Plaintiffs' allegations with respect to the number of times they heard the pepper ball launcher discharge.  Instead, Defendants accounts clarify that the pepper ball launcher initially misfired.  But after non-party CO Litzner adjusted the launcher, he fired only four pepper balls into Smith's cell.  (ECF No. 92-5, PageID.785; ECF No. 92-13, PageID.906 (Miller Dep. 21:24-21:25).)  Inventory records provided by Defendants show that prior to October 20, 2020, the facility had 375 pepper balls in its inventory, and following October 20, 2020, the facility had 370 pepper balls in its inventory.  (ECF No. 92-11, PageID.868.)  As such, it is clear that <u>at most five pepper balls were utilized during the October 20, 2020, cell extraction</u>.  *Scott v. Harris*, 550 U.S. 372, 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment.")

Furthermore, there is no question that prior to being extracted from his cell in C-Block, inmate Smith threw a cup of human waste, and then a cup itself, at an MBP staff member.  That much is confirmed by Defendants' sworn statements as well as

23

the surveillance footage from October 19, 2020.  (ECF No. 92-5, PageID.784; Defs.' Ex. A-1 at 00:10-00:19.)  As such, facility staff determined that it was necessary to extract Smith from his cell.  And the video footage of the extraction confirms that Sgt. Wittler repeatedly instructed Smith to come to his cell front for restraints prior to the deployment of the pepper balls.  (Defs.' Ex. A-1 at 00:38-00:100.)  But Sgt. Wittler says that Smith refused, and simply stared at Sgt. Wittler from where he lay on his bunk.  (ECF No. 92-5, PageID.785.)

By all accounts before the Court, the ERT conducted the October 20, 2020, cell extraction and ultimately utilized a pepper ball launcher in a good-faith effort to restore or maintain discipline after a C-Block inmate assaulted a facility staff member.  Plaintiffs' reliance on the "indiscriminate barrage" of pepper balls to establish malicious intent on the part of Defendants falls short of creating a genuine issue of material fact as to the subjective component of their Eighth Amendment claim of excessive force.  And though Plaintiffs allege that some of the defendants told Plaintiffs that they could have avoided the October 20, 2020, incident by declining to participate in the URF disturbance, those statements do not establish that Defendants deployed the chemical agents with the intent to harm or otherwise punish Plaintiffs for the URF disturbance.  At most, those statements serve as an acknowledgement that had Plaintiffs declined to participate in the disturbance, they would not have been transferred to MBP's C-Block.  The undersigned therefore turns to Defendants' alternative assertion that Defendants deployed the chemical agents in deliberate indifference to their COVID-19 diagnoses.

24

The October 20, 2020, video footage makes clear that prisoners in the C-Block were emphatically complaining about the use of chemical agents prior to, during, and after the extraction.  (Defs.' Ex. A-3 at 01:00-05:51.)  Plaintiffs Witherspoon and Regains attest that they were among the prisoners lodging these complaints. Plaintiff Witherspoon says that he told members of the ERT that he was asthmatic and that he had tested positive for COVID-19.  (ECF No. 98-1, PageID.1029 (Witherspoon Dep. 14:20-14:25).)  Plaintiff Regains says that he spoke to CO Binner about the use of chemical agents, but that she ignored him.  (ECF No. 98-2, PageID.1042 (Regains Dep. 18:7-18:18).)

But once again, Defendants' accounts of the incident do not contradict Plaintiffs' allegations that at least some of the defendants knew that Plaintiffs had tested positive for COVID-19, and nevertheless participated in a cell extraction utilizing chemical agents.  Instead, Defendants accounts shine a light on their state of mind.  Specifically, Defendants provide that before the ERT assembled for the October 20, 2020, extraction, staff discussed the fact that prisoners in C-Block had tested positive for COVID-19. (ECF No. 92-5, PageID.784-785; PageID.785; ECF No. 92-17, PageID.988 (Huss Dep. 29:9-30:17).)  Staff therefore made the conscious decision to utilize pepper balls in lieu of an aerosol spray if Smith refused to comply with the extraction.  Staff made that decision because pepper balls are less likely to affect the surrounding area than aerosol spray.

Ultimately, it is the undersigned's opinion that there are no genuine issues of material fact.  Whether or not Plaintiffs experienced the effects of the pepper balls

deployed on October 20, 2020, the ERT's conscious efforts to mitigate Plaintiffs' exposure to chemical agents during the cell extraction directly undermine the subjective component of Plaintiffs' Eighth Amendment claim.  Accordingly, the undersigned recommends that the Court grant Defendants' summary judgment on Plaintiffs' claim that Defendants' use of chemical agents during the October 20, 2020, cell extraction violated Plaintiffs' Eighth Amendment rights.

As an additional matter, the undersigned notes that even had Plaintiffs established a genuine issue of material fact, claims against public officials in their individual capacity "must be based on active unconstitutional behavior and cannot be based upon 'a mere failure to act.'"  *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Salehpour v. University of Tennessee*, 159 F.3d 199, 206 (6th Cir.1998), *cert. denied*, 526 U.S. 1115, 119 S.Ct. 1763, 143 L.Ed.2d 793 (1999)).  Although Plaintiffs sue Defendants in their individual capacities, Plaintiffs fail to show that CO Binner, CO Lamentola, or Warden Huss were personally involved in the alleged misconduct.  (ECF No. 37, PageID.268-269.)

COs Binner and Lamentola were working in the C-Block at the time that the ERT conducted the cell extraction, but they were not part of the extraction themselves.  (ECF No. 92-8, PageID.824 (Lamentola Dep. 13:2-13-8); ECF No. 92-14, PageID.950 (Binner Dep. 26:2-26:4).)  Furthermore, the evidence shows that Deputy Warden Tasson was the individual who approved the ERT, not Warden Huss. Warden Huss was not working on October 20, 2020, and was not aware of the cell extraction until she returned to work.  (ECF No. 92-17, PageID.986 (Huss Dep. 6:3-

6:14).)  And although Plaintiffs allege in their amended complaint that Huss "permitted, encouraged, and ratified a pattern and practice of unjustified, unreasonable, excessive, and punitive use of pepper spray," they provide no factual support for that conclusory allegation.  (ECF No. 37, PageID.286.)

### ii. Refusal of Adequate Ventilation and Medical Care After Use of Chemical Agent

The undersigned now turns to Plaintiffs' claim that Defendants acted with deliberate indifference to the serious medical needs caused by their exposure to chemical agents by failing to ventilate the housing unit or provide Plaintiffs with medical care after the October 20, 2020, cell extraction.

As an initial matter, Defendants point to MBP Physical Plant Supervisor Sundholm's affidavit, in which he explains that MBP's ventilation system draws air from inside of the cells to outside of the cells, while a make-up air unit in the attic draws fresh air from the outside and circulates it through the housing units.  (ECF No. 92-10, PageID.865.)  But more significantly, Defendants provide medical records demonstrating that the majority of Plaintiffs were visited by a Registered Nurse (RN) within hours of the October 20, 2020, cell extraction.

Medical records show that RN Jessica Wright attempted to visit Plaintiffs McCoy and Wallace on October 20, 2020, for their daily COVID-19 assessments. (ECF No. 92-12, PageID.873, 880.)   Plaintiffs McCoy and Wallace declined the assessment after reporting that that they were not exhibiting any symptoms of COVID-19.  (*Id.*)

RN Wright also visited Plaintiffs Dorsey, Stovall, Thompkins, and A. Taylor on October 20, 2020.  During the visits, she measured their temperature, pulse, respiration, and blood oxygen level.  Dorsey reported that he was experiencing shortness of breath, which he believed to be "due to the use of chemical agent in [Dorsey's] unit the previous night." (*Id.*, PageID.970)  Stovall likewise reported "chest discomfort with inhalation" and that the "recent use of chemical agent in housing unit . . . made [his] symptoms worse." (*Id.*, PageID.874.)  As did A. Taylor.  (*Id.*, PageID.876.)  Thompkins reported that although he was not experiencing shortness of breath, he did have a headache. (*Id.*, PageID.878.)  RN Wright ultimately advised each of the men to rest and hydrate.

After receiving a call from custodial staff on October 20, 2020, informing her that Witherspoon was experiencing pain while breathing, RN Wright also visited Plaintiff Witherspoon.  (*Id.*, PageID.881.)  During the visit, Witherspoon reported that his symptoms were worse with movement and while taking deep breaths, and that he was experiencing pain in his chest, back, and left leg.  As with the others, RN Wright measured Witherspoon's temperature, pulse, respiration, and blood oxygen levels. (*Id.*, PageID.881-882.)  She also referred Witherspoon to the onsite provider for his asthma-related concerns and advised him to rest and hydrate.

The same day, Physician Assistant (PA) Joshua Kocha visited Witherspoon. (*Id.*, PageID.883.)  Witherspoon informed Kocha that he "always has a sharp chest pain" but that it had been worse since the night before.  PA Kocha educated Witherspoon as to COVID-19 symptoms that he should be on the lookout for and told

him to notify health care if there were any changes in his condition.  (*Id.*)  PA Kocha also noted that Witherspoon's "pulse ox" was "excellent," that his pulse was "low normal," and that he did not "show any outward signs of distress, pain, or anxiety." (*Id.*)

Finally, Plaintiff Kelly was seen by RN Kimberly Cheslik on October 20, 2020. (*Id.*, PageID.872.)  Kelly complained of mild shortness of breath.  RN Cheslik measured his temperature, pulse, and blood oxygen level during the visit.  (*Id.*)

Defendants do not provide October 20, 2020, medical records for Plaintiffs Regains or Webb.  But during his deposition, Plaintiff Regains attested that during the COVID-19 outbreak, nurses did rounds in C-Block every day.  (ECF No. 98-2, PageID.1040 (Regains Dep. 11:11-11:24).)  And while he stated that the daily rounds did not involve much interaction between the prisoners and the nurses, he further attested that every few days, a nurse would come to his cell, put a device on his finger, and measure his lung function.  (*Id.* (Regains Dep. 11:25-12:25).)  Plaintiff Webb similarly recounted that at the time of the cell extraction, nurses did rounds in C-Block every day during which they checked his temperature and pulse and provided him with multivitamins.  (ECF No. 98-6, PageID.1077 (Webb Dep. 14:24-15:17).)

As set forth above, Plaintiffs say that their exposure to the pepper balls caused them to experience burning sensations in their eyes and lungs, shortness of breath, chest pains, and vomiting.  But even accepting that Plaintiffs experienced these side effects, Plaintiffs' medical records, along with the deposition testimony of Plaintiffs

Regains and Webb, create a hurdle for Plaintiffs' deliberate indifference claim that Plaintiffs do not clear.

Specifically, the records establish that Plaintiffs received medical attention in the days, if not the hours, following their exposure to chemical agents, regardless of any allegations to the contrary.  *Scott*, 550 U.S. at 380; *Coverdale v. Conley*, No. 1:19-CV-920, 2022 WL 950307, at *3 (S.D. Ohio Mar. 30, 2022) (rejecting the plaintiff's argument that the magistrate judge improperly applied *Scott* in determining that the plaintiff's self-serving statements were blatantly contradicted by his medical records because those records could have been forged), *aff'd*, No. 22-3378, 2023 WL 246831 (6th Cir. Jan. 18, 2023).  To succeed on a claim of deliberate indifference, plaintiffs complaining about a delay in the medical treatment of "minor maladies or non-obvious complaints of serious medical needs" must place medical evidence into the record verifying the detrimental effect of the delay.  *See Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890,  (6th Cir. 2004) (citing *Napier v. Madison Cty.*, 238 F.3d 739, 741-42 (6th Cir. 2001)).  Plaintiffs seem to argue that their respiratory symptoms constituted obvious medical needs, which would fall outside of the scope of *Napier* and would not require verifying medical evidence.  (ECF No. 98, PageID.1019.)  But as provided by this Court in *Armour v. Horton*:

> When [a complaint of difficulty breathing] is temporally proximate to being sprayed with a chemical agent or returned to a cell where the chemical agent was sprayed, difficulty breathing would be expected and does not suffice to show a serious medical need.  Indeed, courts have held that, when the only symptoms of exposure to chemical agents is to cause a prisoner to cough, choke, gag, and experience burning to the eyes— "the transitory effects of the pepper spray"—a plaintiff's allegations are

> insufficient to meet the objective prong of the Eighth Amendment
> standard.

No. 2:21-CV-204, 2022 WL 354521, at *5 (W.D. Mich. Feb. 7, 2022) (citations omitted) (collecting cases).

Accordingly, it is the undersigned's opinion that Plaintiffs had to place medical evidence into the record verifying the detrimental effect of that delay between their requests for medical care and their receipt of medical care. Plaintiffs provided the Court with no such evidence. The undersigned therefore recommends that the Court grant Defendants summary judgment as to Plaintiffs' claim that Defendants acted with deliberate indifference to the serious medical needs arising out of their exposure to chemical agents on October 20, 2020.

### c. First Amendment Retaliation

Moving forward, the undersigned addresses Plaintiffs' claim that Defendants deployed the chemical agent on October 20, 2020, and later refused to provide them with adequate ventilation or medical care in order to retaliate against them.

Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to establish a First Amendment retaliation claim, a plaintiff must show that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated by the protected conduct. *Id.* To prevail on a retaliation claim, retaliatory motive "must be a 'but-for' cause [of the

injury], meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1721 (2019).

As set forth above, the majority of Plaintiffs assert that Defendants retaliated against them based on their participation in the URF disturbance. (ECF No. 98-3, PageID.1054 (Stovall Dep. 28:12-28:17); ECF No. 98-4, PageID.1059 (Wallace Dep. 9:15-9:18); ECF No. 98-6, PageID.1076 (Webb Dep. 9:4-9:17).) Plaintiff Wallace says that when he asked staff for medical care after the pepper balls were deployed in C-Block, they told him something along the lines of: "Y'all shouldn't have did [sic] that riot. If you got a [sic] issue, write a grievance." (ECF No. 98-4, PageID.1059 (Wallace Dep. 13:10-13:13)). Webb similarly attests that when Plaintiffs asked for medical attention, staff stated: "This is not Neebish Unit. Ya'll shouldn't have done that over there . . . ." (ECF No. 98-6, PageID.1076 (Webb Dep. 9:4-9:11).) But Plaintiffs' alleged participation in the URF disturbance does not constitute protected conduct. *Richardson v. Thomas*, No. 1:19-CV-711, 2019 WL 5078293, at *3 (W.D. Mich. Oct. 10, 2019) ("In the prison context . . . prisoner riots and strikes violate prison rules and, thus, are not protected conduct." (citing *Lockett v. Suardini*, 526 F.3d 866, 874 (6th Cir. 2008))). As such, even if Plaintiffs could establish that Defendants took adverse actions against Plaintiffs based on their participation in the URF disturbance, Plaintiffs cannot establish a claim of First Amendment retaliation.

But Plaintiffs also attest that they complained about the conditions of C-Block upon their arrival to MBP. Plaintiff Wallace provides that after their arrival to MBP, C-Block inmates "kept writing grievances about the cell conditions and black mold.

32

And, like, guys was [sic] finding dead rats in they [sic] cell, all types of stuff.  And we — we — we was [sic] kiting and writing grievances about all that prior to COVID." (ECF No. 98-4, PageID.1062 (Wallace Dep. 23:14-23:17).)  Plaintiff Webb similarly provides that when C-Block inmates first arrived at MBP, Warden Huss visited C-Block, and the inmates complained about the conditions of the housing unit.  (ECF No. 98-6, PageID.1078 (Webb Dep. 23:14-23:17).)

The Sixth Circuit has explained that "protected conduct includes a prisoner's 'undisputed First Amendment right to file grievances against prison officials on his own behalf.'"  *Hill v. Lappin*, 630 F.3d 468, 472 (2010) (quoting *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir.2000)).  This right extends to grievances that are, in accordance with MDOC policy, raised with staff prior to submitting a formal, written grievance.  *Maben v. Thelen*, 887 F.3d 252, 265-66 (6th Cir. 2018) (explaining that it would be "unfair and illogical" to require prisoners to attempt informal resolution of a grievable issue, and then limit the recognition of protected conduct to filing formal, written grievances); MDOC PD 03.02.130(Q) (requiring a prisoner to attempt resolution of the grievable issue prior to filing a Step I grievance).  As such, it appears that Plaintiffs did engage in protected conduct prior to the October 20, 2020, incident.

The problem is that Plaintiffs offer no evidence that Defendants, with the exception of CO Lamentola and Warden Huss, were aware of let alone motivated by Plaintiffs' prior complaints or grievances.  And while Plaintiffs allege that they made complaints directly to Warden Huss upon their arrival at MBP, Huss was not working at MBP on October 20, 2020.

Plaintiff Regains provides that when C-Block prisoners complained about the use of chemical agents, Defendant Lamentola responded with: "You guys like complaining and writing grievances, well there you go." (ECF No. 98-2, PageID.1044 (Regains Dep. 26:15-26:19).)  But even accepting that CO Lamentola made such a statement, CO Lamentola was not a member of the ERT and was not involved in the October 20, 2020, cell extraction.  (ECF No. 92-8, PageID.824 (Lamentola Dep. 13:2-13-8).)  Furthermore, Plaintiffs seem to concede that Lamentola took remedial measures after the pepper balls were deployed by turning on fans and opening windows in C-Block.  (ECF No. 98, PageID.1016-1017 ("Despite Plaintiffs' agonizing pleas, Defendants did little to provide relief.  Lamentola opened some windows across the hall around 20 feet away and turned on a shower fan about 75 feet from the exposure area.  But he did not open the unit's front door for ventilation." (citations omitted)).)  And the evidence discussed above establishes that Plaintiffs received medical attention in the days following the cell extraction.  As such, even accepting that Lamentola took issue with Plaintiffs' grievances and complaints at MBP, he does not appear to have taken any adverse actions against Plaintiffs.  Accordingly, the undersigned recommends that the Court grant Defendants' summary judgment with respect to Plaintiffs' claim of First Amendment retaliation.

### d.  Civil Conspiracy

Plaintiff's final claim is that Defendants conspired to violate their constitutional rights.  A civil conspiracy under Section 1983 is "an agreement between two or more persons to injure another by unlawful action."  *See Hensley v. Gassman*, 693 F.3d 681,

695 (6th Cir. 2012) (quoting *Hooks v. Hooks*, 771 F.2d 935, 943–44 (6th Cir. 1985)). Plaintiffs must show the existence of a single plan, that the alleged coconspirator shared in the general conspiratorial objective to deprive the plaintiffs of a federal right, and that an overt action committed in furtherance of the conspiracy caused an injury to the plaintiffs.  *Id.* at 695; *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011).

In the undersigned's opinion, Plaintiffs have provided no evidence that Defendants had a single plan, that Defendants shared in a general conspiratorial objective, or that Defendants committed overt actions in furtherance of the conspiracy.  Instead, Plaintiffs' allegation that Defendants conspired against them is purely conclusory.  The undersigned therefore recommends that the Court grant Defendants' motion for summary judgment as to Plaintiffs claim of civil conspiracy.

## V.    Qualified Immunity

In addition to arguing that they did not violate Plaintiffs' constitutional rights, Defendants assert that they are entitled to qualified immunity.  (ECF No. 92, PageID.735-736.)

Defendants' claim of qualified immunity is largely redundant.  After initially arguing that that they are entitled to judgment because they did not violate Plaintiffs' constitutional rights, Defendants argue that they are entitled to qualified immunity because they did not violate Plaintiffs' constitutional rights.  (*Id.*, PageID.735.)  But Defendants alternatively argue that it was not clearly established as of October 20,

2022, that exposing prisoners with COVID-19 to chemical agents violated their constitutional rights.  (*Id.*, PageID.736.)

Because it is the undersigned's opinion that there are no genuine issues of material fact, and that Defendants did not violate Plaintiffs' constitutional rights, it is the undersigned's opinion that Defendants are entitled to qualified immunity in their individual capacities.  *See Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008) ("Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))).

## VI.    Failure to Serve

As a final matter, the undersigned addresses Plaintiffs' lack of service with respect to Defendant Beminster.  Federal Rule of Civil Procedure 4(m) sets forth the deadline for service of process.  It provides the following:

> If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed. R. Civ. P. 4(m).

As set forth above, Plaintiffs filed their initial complaint on March 2, 2021. (ECF No. 1.)  On June 16, 2021, the Court severed Plaintiffs' claims into new, related actions.  (ECF No. 15.)  When the Court severed Plaintiffs claims, it ordered each

individual Plaintiff to file amended complaints in their respective cases.   (*Id.*, PageID.179.)

On July 13, 2021, Witherspoon filed an amended complaint in accordance with the Court's orders.  (ECF No. 18.)  The Court then stayed the case and referred it to early mediation.  (ECF No. 21.)  On April 7, 2022, the Court removed this case from early mediation and ordered Witherspoon to provide the Court with copies of his complaint for service on each Defendant.   (ECF No. 26, PageID.238.)   Because Witherspoon proceeded *in forma pauperis*, the Court ordered service by the U.S. Marshals upon the Court's receipt of the requisite copies.

On March 22, 2022, attorney Ronnie Edward Cromer, Jr. appeared on behalf of Plaintiffs, and moved to consolidate the twelve remaining cases.  (ECF No. 27.) Because Plaintiffs were no longer proceeding pro se, the Court granted the motion and reconsolidated the cases.  (ECF No. 30, PageID.251.)

On May 10, 2022, the MDOC returned the waiver of service for Defendant Beminster to the U.S. Marshals Service unexecuted, explaining that they were unable to identify such a person  (ECF No. 31, PageID.253.)  On May 26, 2022, the MDOC returned the summons for Defendant Beminster to the U.S. Marshals Service unexecuted, explaining that they do not and have not ever had an employee by the name of Beminster.  (ECF No. 41, PageID.398.)  The Court received executed waivers of service from Defendants Wittler, Huss, Lamentola, Miller, and Binner.  (ECF Nos. 32, 35, 36.)  Plaintiffs filed their amended complaint on June 24, 2022.  (ECF No. 37.)

But though the U.S. Marshals Service was unable to identify and serve Defendant Beminster in May of 2022, the record contains no indication that Plaintiffs have attempted to identify, locate, or otherwise serve Defendant Beminster over the past two years.  In cases where plaintiffs proceed *in forma pauperis*, the U.S. Marshals Service is responsible for service "once reasonable steps have been taken to identify for the court the defendants named in the complaint." *Byrd v. Stone*, 94 F.3d 217, 219 (6th Cir. 1996); *see also* 28 U.S.C. § 1915(d) ("The officers of the court shall issue and serve all process and perform all duties in such cases.").  Because it does not appear that Plaintiffs have taken reasonable steps to identify Defendant Beminster, the undersigned respectfully recommends that unless Plaintiffs can demonstrate good cause for their failure to serve Beminster, the Court dismiss Beminster from the case in accordance with Rule 4(m).

## VII.    Recommendation

The undersigned respectfully recommends that the Court grant Defendants' motion for summary judgment.

In the undersigned's opinion, there are no genuine issues of material fact remaining in the case. Defendants have established that they utilized chemical agents during the October 20, 2020, cell extraction in a good-faith effort to maintain discipline.   And Defendants have established that they were not deliberately indifferent to Plaintiffs' COVID-19 status where they chose to use pepper balls during the extraction rather than pepper spray.   Nor were Defendants deliberately indifferent to Plaintiffs' serious medical needs following the cell extraction; Plaintiffs

symptoms were consistent with second-hand exposure to chemical agents, and Plaintiffs received medical attention soon after the extraction. Furthermore, Plaintiffs cannot establish that Defendants retaliated against them where their alleged participation in the URF disturbance did not constitute protected conduct, and the only Defendant who referenced Plaintiffs' prior complaints and grievances did not take adverse actions against them. Finally, beyond their own conclusory allegations, Plaintiffs have provided no evidence that Defendants conspired against them.

The undersigned additionally recommends that the Court dismiss Plaintiffs' claims against Defendant Beminster based on their failure to serve Defendant Beminster in accordance with Federal Rule of Civil Procedure 4(m).

If the Court accepts these recommendations, this case will be dismissed.


Dated: May 15, 2024                          /s/ *Maarten Vermaat*
                                             MAARTEN VERMAAT
                                             U. S. MAGISTRATE JUDGE


## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).